Deaderick v. Wilson.

JAMES G. DEADERICK et al v. R. T. WILSON et al.

1. PRIVATE CORPORATIONS. *Amendment of charter.* A charter being a contract, where the original charter provided that no amendment should be made except on the unanimous petition of the president and directors, and any amendment so recommended to be unanimously accepted by the president and directors, an amendment accepted and adopted by the president and directors unanimously will be valid as a substantial compliance with the condition, although not recommended by the unanimous petition of the president and directors, that provision being merely directory.

2. SAME. *Same.* Where an unauthorized amendment was adopted by the directory of a corporation, on the faith of which a consolidation was made, under legislative sanction, with another corporation, by which a new corporation was created, with all the powers assumed by the first, stockholders consenting to the consolidation are estopped to question the amendment.

3. SAME. *Same. Directors. Authority of.* Directors are not technical parties, but only trustees in a general sense, as are agents and bailees entrusted with the care and management of property. They may pur-

chase stock from stockholders without being subject to the stringent rule governing dealings between trustee and *cestui que trust.*

Cases cited: Overend *v.* Gibb, 3 Eng. Rep., 7–17; Liquidators *v.* Coleman, 6 Eng. R., 26–33; Delaware Railroad Tax, 18 Wall., 229–30; Commissioners *v.* Reynolds, Amer. L. Reg., 376; Spering's Appeal, 71 Pa. Amer. Rep., vol. 10, p. 689; Post *v.* Russell, 36 Ind., 60; Smith *v.* Hurd, 12 Ind., 371; Union Bank *v.* State, 9 Yer., 490; Brightwell *v.* Mallory, 10 Yer., 197; Koeler *v.* Black River Falls Co., 2 Bl., 716–17–18.

4. SAME. *Same. Stockholders.* Stockholders have the right to inspect the books of the corporation at all reasonable times. (Ang. & Ames on Corp., 607.)

5. SAME. *Same. Railroads.* Under the ordinary powers granted to a railroad having its *termini* in this State, the directory has no power to purchase other railroads without the sanction of the stockholders. (5 Amer. R., 420, 739.)

Cases cited: Phosphate of Lime Co. *v.* Green, Eng. R., vol. 1, pp. 111, 115, 116; Dartmouth College *v.* Woodward, 4 Wh., 518, 715; R. R. Co. *v.* R. R. Co., 5 Amer. L. R., 739–40; Gabriskie *v.* R. R. Co., 6 Amer. L. R., 426; Nichol *v.* Mayor, 7 Hum., 261.

6. CHANCERY PRACTICE. *Multifariousness.* Code, sec. 4325, allows one or several parties having a joint or common interest to join several unconnected matters against the same party or parties in one bill, but does not allow others who have no joint or common interest to join in the suit.

7. SAME. *Same.* Under Code, sec. 4326, the discretion ought to be exercised in favor of retaining the bill with amendments allowed; but where, after the elimination of the multifarious matter, only a mere skeleton remains, it is proper to dismiss the bill without prejudice.

8. SUITS. *How brought. Pleading and practice.* As a general rule, for injuries to the corporate property, the suit must be in the name of the corporation. But if the directors refuse to prosecute, or they are to be made defendants, the stockholders injured may sue, in equity, in their own name, making the corporation one of the defendants. (7 Amer. R., 282.)

---

FROM HAMBLEN.

---

Appeal from the Chancery Court. H. C. SMITH, Chancellor.

J. T. SHIELDS for complainants.

BARTON and BAXTER & SON for defendants.

FREEMAN, J., delivered the opinion of the court.

This bill is filed by James G. Deaderick, N. M. Taylor, John H. Miller (administrator of the estate of Ann C. Taylor), John W. Harle, Wilson Wyatt, Isaac P. Tipton—a portion of whom are stockholders, and a part had sold their stock before filing the bill—in behalf of themselves and all other persons who are the share and stockholders in the corporation under the style and name of the East Tennessee, Virginia and Georgia Railroad Company, excepting such of the shareholders as are made defendants; and is against the said railroad company; R. T. Wilson, who is sued both as president and director and in his own wrong; C. M. McGhee, as vice president and director and in his own wrong; Joseph Jaques, who is sued as vice president, superintendant, director and individually; R. H. Richards, a director and in person; R. C. Jackson and W. C. Kyle; the said Wilson, Jaques, McGhee, Richards and Jackson being sued both as present and former officers and directors of said corporation. In addition to these, by amendment, Rufus T. McAdden and Hiram Libby, non-residents, were made parties—the first as representing the Western North Carolina Railroad, and the second as the party from whom certain bonds of said last mentioned road have been purchased.

We may remark at the commencement of this opin-

ion, that it is difficult to state the general scope of the bill, from the incongruity of the matters alleged and the wide range of statement contained in it, combined with the diverse characters in which defendants are sought to be charged.

The bill· was dismissed on demurrer by the chancellor, said demurrer reaching in its specifications all the matters alleged in the bill. We will dispose of the questions raised in the order presented by the prayer of the bill mainly, and not in the order as presented by the demurrer, or it may be, group the questions so as to include several propositions under one general view.

The first question we discuss is raised by the first and part of the fifth, the sixth and seventh prayers of the bill, together with the subordinate prayers in aid of the relief thus sought. They are as follows:

1. That the defendants be required to produce and file the genuine original contract in writing made with the Southern Railway Security Company, or with Thos. A. Scott, for the sale of the said ten thousand shares of stock, and that the same be decreed to be null, void, and of no validity.

The clause of the fifth prayer is: "But if your Honor shall hold they are not entitled to the relief for which they above pray, that is, to have the sale of ten thousand shares of stock set aside, then they pray that Wilson, Jaques, McGhee and Jackson, with such other directors and officers as were confederated with them in the purchase and sale of said stock, be held to account to the stockholders from whom they

purchased the same, for all profits made and realized by said purchase and sale; but if said sale and transfer is set aside, they pray for an account of such profits and advances in value as may have accrued, and that the parties be required to show from whom they purchased stock, when each purchase was made, the price paid, and through what agency purchased."

The facts on which this latter branch of relief is prayed, may be substantially stated as follows: It is alleged that Wilson, Jaques, McGhee and Jackson, with other officers and directors of the corporation, receiving salaries as such, conceived and formed the design and scheme of speculating in the stock owned by complainants, and others on whose behalf they sue, to the damage of the owners of the stock, and profit of said respondents; that they availed themselves of their superior knowledge, influence and power, and other advantages incident to their positions as such officers and directors, and as trustees for the stockholders, to carry said scheme into execution, and procured the smaller stockholders to transfer to them their shares of stock at prices far below their par value, and far below the prices that their superior information enabled them to foresee said shares would command.

Stripped of all verbiage, this charge is, simply, that officers and directors of a railroad corporation have purchased stock of parties owning small amounts of stock at below the par value of the stock, and below the value which they foresaw it would command—that is, in the future—and that they so purchased because of their superior knowledge of the real

value of the stock, or their superior foresight as to its future value, which knowledge was obtained by means of their official positions.

The legal proposition that underlies it, on which relief is sought, and the charge made, is, that the officers and directors of a corporation of this kind are trustees for the stockholders, or individual owners of the stock, and, as such, cannot be allowed to make a profit out of their trust,—the rule applicable to all trustees in courts of equity. On the correctness and accuracy of this proposition all this branch of the case made by the bill turns, assuming for the present, but not deciding, that complainants have presented them- selves properly before the court to obtain this relief. To this question we now address ourselves.

Numerous cases, both in England and this country, have settled that the position of a director is in some sense one of a fiduciary character; in most of them, directors are stated to be trustees for the stockholders. That this is true in some particulars, is beyond all question. See cases of *Overend, Gurney & Co.* v. *Gibb,* 3 vol. Eng. R., 7–17; *Liquidators* v. *Coleman,* 6 vol. Eng. R., 26–33; 1 Redf. on Railw., 576; and numerous authorities cited in printed brief of Shields' counsel, pp. 29, 30, 31; also cases collected in *Board of Commissioners of Tippecanoe County* v. *Reynolds,* June number Amer. L. Reg., p. 376, decided by Supreme Court of Indiana. To call directors of a corporation trustees for the stockholders, however, without limiting the use of this term by the facts of the cases in which the question has been presented for adjudication,

8—VOL. 8.

is calculated to mislead, and induce a very wrong con-clusion as to the liabilities of officers, or rather agents, of corporations.

As said by Judge Sharswood in *Spering's appeal,* 71 Pa. Amer. Rep. vol. 10, p. 689, "It is by no means a well settled point what is the precise rela-tion which directors sustain to stockholders. They are undoubtedly said in many authorities to be trus-tees, but that, I apprehend, is only in a general sense, as we term an agent or any bailee instructed with the care and management of the property of another. It is certain they are not technical trustees."

This statement of the learned judge, we think, is correct beyond doubt. The officers and directors of a railroad corporation do not have the legal title of the corporate property vested in them as such, to be held by them for the use of the company nor the stockholders; much less have they the title to or con-trol of the individual shares of stockholders.

The corporation, the legal entity, owns the fran-chise and corporate property. The officers and directors are the agents through whom this legal entity acts, and, in the performance of the duties pertaining to their positions, represent the corporation. And so, with reference to the stockholder, who, by virtue of his ownership as his individual property, is entitled to the dividends properly accruing to him as owner of such shares of stock, the officers and directors are under obligations to the faithful management and use of the corporate franchise and property, so as to secure him the benefit of such dividends. In both cases they

Deaderick *v.* Wilson.

are responsible, under certain circumstances, in a proper proceeding in a court of equity, and probably in some cases in a court of law, for any wrong conduct in violation of the rights of either the corporation or injuriously affecting the interests in which the stockholder is concerned. In a word, they are agents charged with the performance with fidelity of the duties that grow out of their position, as defined by the powers, objects and purposes of the charter of the company. To this extent is their position fiduciary, and for breaches of good faith in the performance of these trusts they are held responsible. These general propositions, though sound in our judgment, may, in their application to particular cases, require some qualification; but, as general propositions, we think they embody the true idea on which the responsibility of such parties rest, as deducible from the cases and the nature of the positions themselves.

But do these principles sustain the argument of complainants, and the theory of their bill on this branch of the case? It is, first, that the shares of stock, amounting to ten thousand, sold by defendants Thomas A. Scott, or Security Company, be declared null and void, for reasons that will be referred to hereafter. Second, if this is not done, then that defendants be held to account to the stockholders from whom they purchased, on what stock they purchased from them, for all profits realized by said purchase and sale; and this on the ground that the officers and directors were trustees in such a sense as to forbid their purchasing the shares of stock owned by

individual stockholders, except under the stringent rules that govern as between trustee and beneficiary in a technical trust, or as between principal and agent, attorney and client.

It suffices to say, first, on this proposition, that we have been pointed to no case that holds such a doctrine, and we feel sure none can be found going this length. We are totally unable to see the application of the principle invoked to the case in hand. The officers and directors of a corporation are charged with no trust, nor fixed with any duty, as far as we can see, as to the sale or disposition or transfer in any way of the shares of stock owned by the shareholder. They have no power to control its sale or transfer, are charged with no duty in reference to such sale or transfer, by reason of their official position. They, as individuals, might by contract assume such duties, as any other parties might, and would then be held responsible individually as others under like circumstances. But officially they could not, probably, assume or undertake such a duty; certainly not without the previous authority of the corporation, regularly conferred. It certainly is not in the line of the duty of the president, directors, or other officers of a railroad company, to sell the shares of stock owned by the shareholders. If not, then as such they can be charged with no breach of trust or duty in connection with said transfer or sale growing out of their official relation to the company, for no such duty is imposed or trust assumed to be violated. Nor can it be said that such officers may not, as individ-

uals, purchase and hold stock in the corporation of which they are members; certainly not, unless prohibited so to do by the Legislature. No such prohibition is shown. In fact, we believe it is a general qualification in all corporations of this character that the directors and officers shall own stock, and in most cases, in order to be eligible to offices of a certain character, to own some considerable amount of it. There being no limit as to the amount which he may own, as a matter of course he may purchase it, and if he may do this, he must necessarily do so from an owner, and that must be a stockholder. Whether he owns much or little, can have no possible bearing on the question of his right to sell, nor of the other to buy. After all, the simple question involved is, whether the officers and directors are free to purchase stock from a shareholder in the corporation on the same terms as others. To this there can be but one answer, that is, they may, unless prohibited by legislative restriction.

The true relation between directors and officers of a corporation and the shareholder, is thus stated by Chief Justice Shaw in the case *Smith* v. *Hurd,* 12 Ind. R., 371, cited in A. L. R., vol. 13, p. 378:

"There is no legal privity relation or immediate connection between the holders of shares in a bank, in their individual capacity, on the one side, and the directors of the bank on the other. The directors are not the bailees, the factor's agents, or trustees of such individual stockholders."

In the language of the Supreme Court of Indiana,

in the case from which the above quotation is cited, "stock in a corporation held by an individual is his own private property, which he may sell or dispose of as he sees proper, and over which neither the corporation nor its officers have any control. It is the subject of daily commerce, and is bought and sold in market like any other marketable commodity." This is a clear and accurate statement of the relation of the parties on this subject. We refer to this case for a very complete review of the cases, both English and American, on this subject. See also, *Delaware R. R. Tax*, 18 Wall., 229–30, with authorities referred to by Field, J., as to the character of such property; also, in our State, 9 Yer., 490; 10 Yer., 197.

It being clear and beyond all question, both on sound principle and authority, that the directors or officers of the company were charged with no trust in reference to the sale or disposition, the management or control of the shares of stock owned by the individual stockholders, it follows that none of the responsibilities growing out of this relation attach to them in making such purchase from the stockholder as are contended for by complainant, and that this feature of the bill cannot be maintained, and the demurrer was properly sustained on this question.

It is proper to say, that in all the cases and other authorities cited by complainants' counsel in his learned and elaborate argument, in which directors are called trustees, not one of them hints at the idea that they are trustees, or have any fiduciary relation whatever to the shares of stock owned by the stockholders, so

Deaderick *v.* Wilson.

far as selling or buying such stock is concerned. They are all of quite a different character from the case now under discussion, and the trust relation was applied to a very different state of facts. We cite a few of these authorities by way of illustration. In Story's Eq., vol. 2, sec. 1564, it is said: "So, too, courts of equity will require the officers of joint stock companies to account for moneys received in trust for the company. The directors of a company, on the transfer of its business to another company, received from the latter a large sum for compensation, the particulars of which they withheld from the members, and it was held that they were trustees *of the* money for the members, and they were ordered, on application for an injunction, to pay it into court." It is obvious this has no application to the question which we have discussed. We need not go through with the authorities cited by counsel. They are all cases where the directors have either made a profit out of the use of the corporate property, or derived some personal advantage, which of right ought to have gone to the corporation of which they were agents or managers, and in which the shareholder, as a member of the corporation, had an interest that was or might. have been injured by the wrong done. They were properly held responsible as trustees in such cases, because of a violation of duties assumed and growing out of their relation to the corporation and its members, of which they were officers. But no case has been found, nor do we believe can be, where any trust has been fixed on officers or directors of a cor-

poration in relation to the individual shares owned by the stockholder as his private property. With this, as we have said, the officers, as such, of the corporation have no concern or connection whatever, either in law or in fact. See cases on this question. *The Liquidators &c.,* v. *Coleman & Knight,* 6 vol. Eng. Reps., 18; *Post* v. *Russell,* 36 Ind., 60; Amer. R., p. 5, vol. 10, and cases cited; *Overend, Gurney & Co.* v. *Gibbs; House of Lords Cases,* in Eng. R., p. 1; *Koeler* v. *Black River Falls Co.,* 2 Bl., 716–17–18.

This brings us to the relief sought, as against the sale of ten thousand shares owned by respondents to the Southern Railway Security Co., or with Thomas A. Scott. The charge of facts on which this relief is based is briefly as follows:

"That there exists in the United States a combination of capitalists, whose purpose is to make money for themselves by obtaining the control of the great lines of railroads in the Middle and Southern States. That this combination has obtained an act of incorporation by the Legislature of Pennsylvania, under the style of 'The Southern Railway Security Company,' popularly known," says the bill, "as 'Tom Scott,' from the fact that the combination or corporation is controlled and managed by Thomas A. Scott."

It is also stated that respondents have an interest in said corporation, owning a large number of shares in the stock of the same. It is then alleged that, in September, 1871, Wilson, McGhee and Jaques, being officers of the railroad company, owned only 8,350 shares of stock in said railroad company, and, intend-

ing to purchase the remainder at depreciated rates, did sell and transfer to "Tom Scott," or the Southern Railway Security Company, ten thousand shares of the stock of the East Tennessee, Virginia and Georgia Railroad Company, at the price of one hundred dollars per share. That ten thousand shares constitute a majority of the stock of said company, and under a certain amendment of the charter, which is referred to, give control of the company, so as to render the minority's stock worthless, at the option of the holder of a majority of votes or stock.

How this last ruinous result is reached, or by what process it can be effected, without equally affecting the value of the stock owned by the majority, we are not informed.

From the fact of this sale to the Southern Security Company, or to Scott, is deduced the conclusion, that it is a sale of the railroad to a corporation in a distant State, that it is a violation of the sovereignty of the State of Tennessee, of the charter of the road, a perversion of the franchises granted, a transfer of the property of complainants, and is illegal, unconstitutional, inequitable, contrary to public policy, and unconscionable.

We have given careful thought and attention to this question, and to the able and eloquent argument of counsel in support of it. We are, however, unable, from the facts charged, to see its correctness, or how it can find a legal basis in said facts. The stock must be owned by some one. It is bought and sold in the market as other property of like

kind. There is no limitation on the amount which may be owned by any one individual, nor any rule of law or legislative prohibition against another corporation purchasing said stock. Whoever owns a majority of said stock will, under the present charter, have a controlling influence on the election of directors and officers of the company. Whether this be one man or several, a corporation or an individual, the same result will follow. But when this is done, the officers and directors, as agents of the corporation, have their prescribed duties, and can only act in subordination to and in execution of the powers conferred in the charter, and thus carry out the purposes and objects of the corporation. If they adopt a course in violation of the charter, or in bad faith or fraudulently fail in the faithful performance of their duties, the courts will give the parties concerned all proper redress. In a word, the officers and directors are, it is true, elected by the holders of a majority of the stock, but when so elected, are bound to administer and conduct the affairs of the company according to the law of their creation, and under the same duties, obligations and responsibilities as if elected by the owners of a minority of said stock. In fact, these officers must be elected either by the votes of a majority of the shares of the stock, who have the greater interest in the property, or by that of a minority, if the two stand antagonized to each other, and we see no good reason why the greater should not have the most weight in the management of such institutions, unless prohibited by the charter; certain it is, we can

see no good ground on which such control should be given to the minority interest in preference to that of the majority.

We need not discuss at length the deduction or assumption that the sale of a majority of the shares of stock of a company of this kind is a sale of the railroad, or the corporate property, or its franchise. It is no such thing. The company, the legal entity, owns all the corporate property and franchises it ever owned. The ownership of the stock does not give any title to the capital stock or property owned by the corporation. The two properties are separate and distinct, as we have shown in the previous part of this opinion. How can a sale of the one, then, be a sale of the other? Upon this theory, a corporation of this character might change or modify its ownership every day in the year, by the simple act of transferring the shares of stock in the market, by the owners of such stock.

In a word, we hold that the sale of ten thousand shares of the stock of this company, or of any number whatever, is neither, in law or in fact, a transfer of the road, the corporate property or its franchise; and this portion of the bill, and the argument based upon it, must fail.

We next examine the question raised by the 8th prayer of the bill. It is, that Wilson, McGhee and Jaques, and such other officers and directors as were guilty of the malfeasance, be held to account for all loss which resulted to the stockholders in consequence of the neglect, failure and refusal to call a meeting

and consider the proposition of Gen. Mahone to take the entire stock of the company, or all such as should be offered, at one hundred dollars per share, and assent to the same in some lawful manner in their discretion. This is based on a statement, which we need not give at length, but which is, substantially, that a proposition for a consolidation under one harmonious management, in the language of the bill, of the several roads that form the great line of railway from Memphis, Tenn., to Norfolk, Va., and that a number of railroad managers ardently desired this result, among them, we gather, Gen. Mahone, president of the Atlantic, Mississippi and Ohio Railroad Company, who seemed to lead in endeavoring to effect this result. In order to enable him to carry out this purpose, he desired to purchase a controlling interest in the shares of the stock of the East Tennessee, Georgia and Virginia Railroad Company, and was willing to pay one hundred dollars per share for the same.

Without going into the history of this transaction, which failed to be effected, we need but say that no relief can be given, such as is asked, for several reasons. In the first place, we know of no duty on the part of respondents to call a meeting of stockholders in order to effect a sale of the stock of their company to the president of another company. In the second place, there is no basis of facts given on which it can be seen that such an arrangement would have resulted in profit, or its failure in a loss, to complainants, or any one else. In the third place, such damages would be of the most speculative character,

having so many elements of contingency in the basis on which they would have to be calculated, that no court could possibly arrive at any definite conclusion on the subject. Whether the consolidation of this company with other lines, even if the terms of such consolidation were before us (as they are not), would have proven profitable or the contrary, is a question not susceptible, perhaps, of any definite proof, and witnesses, if called on, could only give an opinion based upon speculative calculations. We think the demurrer to this part of the bill was well taken.

It is not improper to add, that the complaint in the bill, based on failure of the officers and directors to call this meeting and arrange to allow Gen. Mahone to purchase a controlling interest in the stock of the road, is not very consistent with the view taken in the bill of the conduct of the parties who sold their ten thousand shares of the stock to the Southern Security Company. If the latter was a transfer of the road to that company, the other would equally have been a transfer to Gen. Mahone. Which would have been the better transaction it is impossible for this court to decide. As between two such rival schemes, this court can feel no possible interest in the success of either the one or the other in their plans.

In the 4th prayer of the bill, the court is asked to declare void an amendment to the charter, adopted on the consolidation of the East Tennessee and Virginia Railroad Company with the East Tennessee and Georgia Company, and without obligatory force on the stockholders. By the original charter of the East

Tennessee and Virginia Railroad Company, the stock-holders were entitled to vote according to a certain scale therein prescribed, provided that no individual, corporation or company (as stated in the bill), what-ever number of shares he or it might hold, should be entitled to more than five hundred votes. It is charged that the power to amend the charter reserved in sec. 28, was only to be exercised by the Legisla-ture on the unanimous petition of the president and directors, and any amendment so made, in order to be obligatory on the stockholders, is to be unanimously accepted and adopted by the president and directors. Assuming this to have been. a fundamental article in the charter, it would, in our opinion, be in the na-ture of a contract, and no amendment could have been rightfully made to bind the stockholders who might dissent from it without a substantial compliance with the provision. As to the amendment being passed or enacted by the Legislature only on the petition. referred to, we do not think the failure to show that a unan-imous petition had been passed would defeat or ren-der void such amendment, provided it was adopted and accepted by a unanimous vote of the president and directors, as this is the act which was looked to as giving binding force to the enactment upon the corporation. The requirement of a unanimous petition may well be held as directory, but the act which was to fasten the amendment on the corporate body must be held imperative, and its performance a condition precedent to the adoption of the new feature of the charter. But the question recurs, as this assent is in

the nature of a contract, in which the assent of the parties concerned is to give it validity, whether the complainants, on the statements of their bill, are entitled or are in a position to ask relief against this amendment. They charge, upon information and belief, that the amendment was not unanimously adopted by the president and directors, it is true; but then they further state, that in pursuance of an act of the Legislature of February 25, 1869, and by the 3d section of said act, the East Tenn. and Virginia Railroad Company had consolidated with the East Tenn. and Georgia Company, and that the corporate franchises, including the obnoxious amendment, were adopted by the consolidated company, and that this amendment was one of the chief inducements to such consolidation. It is provided in said 3d section of the above act, that on such consolidation of any railroad companies, the corporate franchises of either road may be adopted by the company thus formed. This act having been consummated as a contract between the two companies, by which a new corporation was in effect formed, would, if nothing else appeared, estop the parties now from objecting to the binding force of this amendment. It has become the basis of new obligations and important arrangements, and of a most important and vital contract, and as part of the consideration for the same, cannot now be stricken down by reason of any supposed objection to it that might have affected its binding force on the old company. It has now become a fundamental article of the new corporation, and as such must stand. Complainants

have, however, in addition to these facts, expressly ratified and confirmed what has been done, so far as this proceeding is concerned, by adding: "Your orators do not at present propose to pray for any relief against said legislation, or the proceedings thereunder in the matter of consolidation." If the contract of consolidation is to stand, then the consolidation, or a material consideration and inducement to it, cannot be taken away, but must remain and be binding on the parties to it. In addition, if more was wanting, complainants, who are stockholders, sue as stockholders in the new corporation, and assuming to be corporators in the new company, they cannot repudiate one of its fundamental articles. They are clearly estopped from the relief asked for in this prayer. *Phosphate of Lime Co.* v. *Green,* Eng. R., vol. 1, pp. 111, 115, 116.

The next question we notice is based on the charge of purchase of certain railroads, to-wit, the Rogersville and Jefferson Railroad, and the Cincinnati, Cumberland Gap and Charleston Railroad. No relief, however, is asked as against the purchase of the first named railroad, but the contracts shown to have been made, as set out in a report made to the directory in 1872, and adopted by the directors in a meeting of that date, so far as they purport to or were intended to bind the East Tennessee, Virginia and Georgia Railroad Co., are asked to be declared void, and ordered to be cancelled. The latter mentioned road, it seems from the report, was purchased as follows: "At the instance of the board of directors, by C. M. McGhee and R. T. Wilson, for the sum of $214,175.59. This

road to be held by the purchasers, under the direction of the board of directors, until such time as it may be found practicable to unite it with the roads leading from Salisbury, North Carolina, *via* Ashville,"— thus seeking a connection with the North and South Carolina system of railroads, and securing its benefits to the company. The company, as appears from the report, or directors rather, have advanced the money to pay for the purchase of these roads, and by resolution agreed and covenanted with McGhee and Wilson, to hold them free from all losses of every kind whatever, which may in anywise result to them on account of such purchase. In consideration of this understanding, McGhee and Wilson agreed and bound themselves to pay, turn over and relinquish to the company, all benefits, profits and advantages derived, or to be derived, from said purchased roads, which agreement is to be consummated whenever it may be found practicable to unite it with the other mentioned roads, that s, the North Carolina and South Carolina roads. In the mean time, it is stated, this road is being run and operated under the direction of the East Tennessee, Virginia and Georgia Railroad Company's officers.

These facts, in connection with the additional fact that a minority of the directory, representing the feelings and views of the complainants, and their friends, opposed the adoption of this report, and confirmation of this and another contract mentioned in said report, present the question of the power of the directors of a railroad corporation, or of such corporation itself, the officers and directors being but the agents, to pur-

·chase other roads, or guaranty contracts for such purpose, in the State, connecting with their own road, as a means of aiding and facilitating what may be deemed important business connections, and thereby increasing the business of their own company. This is the ·question as to this purchase.

The other two contracts, which may be mentioned here and the questions discussed together, are one, made through the president of the company, R. T. Wilson, .and made between R. T. Wilson and C. M. McGhee as one party, and the East Tennessee, Virginia and Georgia Railroad and one Rufus T. McAdden. The other contract was between Wilson, the company and one Sibley of New York. In these contracts, the company has advanced $100,000 to purchase from McAdden his title to the Western North Carolina Railroad, and a like sum was advanced to purchase $1,057,000 of the bonds of said North Carolina Railroad Company, which were bought from Sibley, as we understand it. This involves the question of the right to use the money of the railroad corporation to purchase a railroad out of the State, and bonds of such a railroad, the object being to secure what is deemed by the officers and directors—or rather a majority of the latter—important business connections, either at ·once or in the future, and whether such a use of the funds is a violation of the obligations and trusts imposed on the officers and directors of such corporation for which the officers and directors of such corporation joining in such purchase will be held to account to the company—and last, the right of complainants, as

stockholders, to sue in equity to have such an account on behalf of the company.

We dispose of the last question first.    It has been earnestly argued that conceding there has been an improper exercise of power by the officers and directors in making these contracts, and in the use of the money of the corporation in carrying them out, yet no suit can be brought or sustained such as this, because the bill does not aver that the directors have on application refused to sue in the name of the corporation, or to allow a suit to be brought in its name for such misapplication.    That this is the general rule there can be no question.    It is based on the principle, that the funds belong to the corporation, not the stockholder, and therefore the corporation should sue for it, or if the shareholders sue it should be with the consent of the corporation to the use of its name. See Ang. & Ames on Corp., p. 367, sec. 312, 6th Ed.; Redf. on R., vol. 2d, p. 335, secs. 9, 10, 11, 3d Ed.    But we think on sound principle, as well as authority, there are well-settled exceptions to this rule.    It is laid down in Ang. & Ames on Corp., 367:  " But as a court of equity never permits a wrong to go unredressed, merely for the sake of form, if it appear that the directors of a corporation refuse in such cases to prosecute, by collusion with those who had made themselves answerable by their negligence or fraud—*or* if the corporation is still *under the control of those who must be defendants in the suit,* the stockholders, who are the real parties in interest, will be permitted to file a bill in their own name, making

the corporation a party defendants." See, also, *Mussina* v. *Goldthwaite*, 7th Am. R., 282, (34 Texas.)

We think this exception is as well based and as sound as the general proposition itself. Applying it to the case before us, taking the facts in the bill as true, it appears, that the parties defendant are the parties who have been guilty of the alleged misuse of the funds; that they are still the officers of the road, and have a controlling interest in its management; that they have procured an endorsement and approval of their contracts by the board of directors, in spite of, and over the opposition of the minority of the stockholders; and are not only interested in their feelings, but pecuniarily, in having these contracts remain undisturbed, and in full force.

Under these circumstances, we hold, that the stockholder may well bring his suit in equity for redress, making the parties complained of defendants together with the corporation, as has been done in this case. If there was no remedy in such cases given in a court of equity, the directors might put the stockholders to defiance, or so embarrass and delay them as to do great injury, and on either ground the jurisdiction, we think, maintainable.

Under the general powers conferred in the original charter of the railroad, and by its scope and design we hold it clear, that the directors and officers had no power to make the contract either in reference to the purchase of the road in this State or beyond its limits. It has become an axiom almost of this branch of the law, that corporations are but

creatures of the law, and can only exercise such pow-
ers as are conferred by their charter of incorporations,
or such as are necessary and proper to carry out, and
enjoy the powers and privileges therein granted. *Dart-
mouth College* v. *Woodward,* 4 Wh., 518, 715.

Or as laid down by Judge Turley in the case of
*Nichol* v. *Mayor and Aldermen of Nashville,* 7 Hum.,
261: "In the State of Tennessee, a corporation is the
creature of the legislative department of the govern-
ment." It exists solely and alone by virtue of its act
of incorporation, and it can exercise no powers but
such as are expressly granted to it, and such as are
the result of necessary and proper implication. Nu-
merous authorities sustain this position, and applying
it to such contracts as are now under consideration,
in reference to the powers given in original charter,
hold them to be *ultra vires*, and beyond the powers
of the corporation, the officers or directors of the same,
and that such a contract, if executory, would certainly
be enjoined, and the parties inhibited from its com-
pletion. We confine ourselves in this statement to
the powers conferred by the original charter. *O. & M.
R. R. Co.* v. *In. & C. R. R. Co.,* 5 Amer. L. R.,
739–40, and cases cited; *Gabriskie* v. *Railroad Co.,*
6 Amer. Law Reg., 426, and cases cited.

As to the precise grounds and what facts must be
shown, on which the officers and directors shall be
held individually responsible, we need not definitely
decide here. We only hold that on the statements
of the bill, a *prima facie* case of violation of duty is
made out, so far as the general power of officers and

directors are concerned, under the powers granted in the original charter. In the language of Judge Deaderick, in the case of *Shea* v. *Knoxville & Ky. R. R. Co.*, September Term, 1873, " the charges of the bill would be sufficiently specific to require an answer from defendants," other things out of the way, and an investigation of the facts and circumstances attending the transaction, in which the question of their liability would depend probably on the question of good faith and honesty in the performance of their assumed duties, or the contrary—in other words, have they been guilty of *evassa negligentia,* or of fraudulent misconduct, in this matter, or was it simply an error of judgment. This seems to be the language of the cases on this question out of our State, as well as the view given in the above case. We do not intend, however, to definitely settle with precision this particular aspect of the case by this opinion.

We hold the same in reference to the question of setting aside said contracts, both the one in the State and beyond it, that is, on the powers granted by the charter of the company originally.

As to what powers were granted by subsequent acts of the Legislature to which we have been referred, and how far these contracts are authorized by the same, or how stockholders, not assenting to such new provisions, are bound, or can be bound by them, we do deem it proper to settle in this opinion, in view of the aspects of the case and other questions presented by the demurrer. Such questions can more properly be settled hereafter, as we shall see.

As to the prayer, that the proceedings of the stock-holders' meeting of November, 1872, be declared void, we need only say, that it is not necessary to say more on this question at present, than that so far as they ratify the contracts complained of, they would probably interpose no obstacle to the action of dissenting stock-holders, in proceeding to be relieved of the contracts, or to hold officers or directors responsible for wrong-ful use of the funds of the company, if a case should be made out, where their action was not authorized by law, or they were liable individually for fraudulent and improper use of the funds of the company. We do not, as we have said, however, decide these questions in this opinion.

The next question presented, is on the prayer of the bill, that Wilson and the other officers and directors be required to answer and show a detailed statement of the bonds issued under the act of the Legislature, ch. 38, passed February 25th, 1869, the amount issued, disposition made of them, and of their proceeds, what was used in the purchase of State bonds, what commissions were charged in their sale or purchase, and by whom. The account sought is, of any profits or benefits realized by any officer or director of the railroad company in such sales. The allegations of the bill on which this prayer is based are in substance, that under the act of 1869, the consolidated company issued bonds to the amount of nearly four millions of dollars, to be used in payment of indebtness of the company to the State—but that the indebtedness to the State was in fact paid by the actual

use of a much less amount than *that*—is the language of the bill; that in the course of negotiations and in the purchase and sale of the bonds, under the provisions of the statutes, a portion of defendants, among whom are Wilson, McGhee and Joynes, realized to themselves very large profits, for which they should account. Taking this charge to be, that in the sale and purchase of the bonds referred to, the officers of the company or directors, had made large profits to themselves individually, then the charge involves clearly a breach of duty on the part of such officers, whose duty it was to make the best disposition possible for the benefit of the company, and any profits realized by them in disposing of the bonds issued by the company, would rightfully belong to the company, their principal, and not to the agents or officers of the same. See cases referred to heretofore, 6 Eng. R., 18.

We do not understand the bill as charging that any. portion of the money arising from the sale of these bonds was used in the. purchase of the shares of stock of the minority of the stockholders. We therefore do not notice that aspect of the case. We may say here, the charge on this question is lacking in specialty somewhat—but we deem it sufficient for an answer. As to the next prayer of the bill for discovery of what profits were otherwise realized, in any manner and by whom, it is too general and vague, and is based on no allegation of facts to sustain it, and is not sufficient to require an answer or discovery from respondents.

That the stockholders have the right to inspect the

books of the corporation, take minutes from the same, at all reasonable times, and may be aided in this, by experts and counsel, so as to make the inspection valuable to them, is a principle too well settled to need discussion. See An. & Am. on Cor., 607; 1 Red. on R., 214.

The 12th prayer of the bill for discovery, whether any officer or agent of the corporation has, by means of loan or use of the money of the company, purchased stock from shareholders, need not be noticed, as no such charge is made in the bill, nor specifications of facts on which such discovery could be asked, or required.

We now come to the question of whether the bill be multifarious, and what shall be its effect on the bill, whether to dismiss, or remand for amendment. We have carefully considered this question. That the bill is multifarious, under any rule that has been laid down to test this question, we think beyond doubt.

In the first place, complainants James G. Deaderick and W. M. Taylor, with the county of Washington, were joined as stockholders, and sue in that right, and to assert their claims as such. The county of Washington having dismissed her part of the suit, the case stands alone in the name of the two others in this aspect of it.

The other complainants had been owners, but had sold their shares, and thus ceased to be corporators, or have any rights, as against the officers of the company. This was an improper joinder of parties, and for diverse purposes. The parties who had sold, want

the sales set aside. This was purely an individual matter with each of them, the subject of an individual suit on his part, and could rightfully be brought alone against parties purchasing, whether one or more, or those concerned in such purchases. The officers and directors, as we ᐧhave held, officially had nothing to do with this matter whatever. In the next place, the company had no interest or concern in this question, as it was not entitled to the control of the shares of stock, nor any profits arising from its sale.

Again, the question of whether the officers and directors failed of their duty in not arranging with Gen. Mahone to put their road under a single control of a company from Norfolk to Memphis, has no necessary connection whatever, as we can see, with the question of misuse of the property of the company, as the sale of the bonds, and profits derived therefrom. Damages for this failure on the basis sought, would not be in anywise related, nor the inquiry on the subject connected with the relief sought in the other matter. It would only complicate the inquiry, but neither aid the other, or be in any way connected with its investigation or settlement—and still less does this question bear any relation to the question of the sale and purchase of the shares of stock from the stockholders, or the sale of the stock owned by Mc-Gee, Wilson and Joynes to the Southern Security Company. We need not point out other incongruous allegations contained in the bill before us. We have stated enough to show that the bill is unquestionably liable to this objection. What shall be the effect of

Deaderick *v.* Wilson.

this is the next question?   By sec. 4355 of the Code,. multifarious uses, misjoinder of parties, is no sufficient cause for dismissing a bill, unless objection is made by demurrer, or motion to dismiss.   A demurrer has been filed in this case.   It is further provided, that " uniting in one bill several matters of equity, distinct and disconnected, that is with each other, against one defendant, is not multifarious."   This only means,. however, that one party or parties having a joint or common interest, may sue another party, where they have several matters of claim, though unconnected,. against the same individual—but does not mean, that parties, who have no common interest, may join in a suit against parties who have no common liability,. such distinct and separate matters.   The idea of the provision is, that a party who has several matters of equity against the same defendant, may bring them in one suit, against such party, but not join others with him, either complainants or defendants.

By sec. 4326 it is provided, that " if the demurrer is sustained, the court may authorize amendments, by directing separate . bills to be filed without new process as to the parties before the court, and by the addition of new parties, or otherwise, as may be deemed necessary for the attainment of justice."   In all proper cases this discretion should be exercised in favor of the bill.   But we do not think this a proper case for its exercise, for several reasons.   The major part of the bill, and its allegations, we have held either to be improperly joined with other matters, or have sustained the demurrer to the relief sought by it.

This would leave, after striking out the improper matter, a mere skeleton, in fact so little of the bill as it now stands would remain, that it would be unintelligible, and would require a new bill to be drawn, or order, to present clearly the questions on which the parties might be entitled to any relief at all. In addition, the questions on which we hold the stockholders might be entitled to, are not made the main matters for relief in the bill, and have not the fullness and particularity of statement, which ought to characterize them in the investigation of questions of such moment.

We refer especially to the charge of the sale of the bonds, which is made in very general terms, and evidently was not deemed a leading ground on which relief was sought by the draftsman of the bill. In In view of these facts, we can see no advantage in sending the case back for amendment, after the greater portion of the bill is dismissed on the demurrer. We think it best, if the parties choose to do so, to give them a chance to file a new bill, in which the questions proper for investigation can be presented in such form, that an investigation may be had of them, without complication, and on distinct and full allegations, which may be equally full answers on the part of the respondents, and thus the question involved be fairly settled.

We have given more than ordinary time to the discussion of the questions involved in the case on account of the magnitude of the interests involved, and the very earnest and persistent argument of the

learned counsel for the complainants. The foregoing gives our conclusions, after a laborious investigation. The result is, the bill must be dismissed for the rea-- sons assigned, with costs.